## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## EVANSVILLE  DIVISION

|  |  |  |
|---|---|---|
| **SOUTHERN INDIANA GAS &** | ) | |
| **ELECTRIC COMPANY, INC.** *d/b/a* | ) | |
| *Vectren Energy Delivery of Indiana, Inc.* | ) | |
| | ) | |
| **Cross Claimant,** | ) | **3:06-CV-48-SEB-WGH** |
| **v.** | ) | |
| | ) | |
| **IOWA PIPELINE ASSOCIATES, INC.,** | ) | |
| *formerly known as KLP Construction* | ) | |
| *Company, Inc.,* | ) | |
| **Cross Defendant.** | ) | |
| _____ | ) | |
| | ) | |
| **SOUTHERN INDIANA GAS &** | ) | |
| **ELECTRIC COMPANY, INC.,** *d/b/a* | ) | |
| *Vectren Energy Delivery of Indiana, Inc.,* | ) | |
| | ) | |
| **Third Party Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **SEMCO CONSTRUCTION PARENT** | ) | |
| **COMPANY, SEMCO IOWA** | ) | |
| **CONSTRUCTION COMPANY,** | ) | |
| | ) | |
| **Third Party Defendants,** | ) | |

## <u>ENTRY & ORDER ON BENCH TRIAL</u>

This matter is before the Court following a two-day bench trial which began on

June 22, 2009.  Earlier in this litigation the Plaintiff settled all its claims, leaving for trial

the crossclaims and third-party claims of Southern Indiana Gas & Electric Company, Inc.

d/b/a Vectren Energy Delivery of Indiana, Inc. ("Vectren").  Vectren's Second Amended

Cross-claims (attachment #1 to Doc. #112) included claims of breach of contract, failure

to indemnify, negligence, fraud and failure to provide insurance against Iowa Pipeline

Associates, Inc. f/k/a KLP Construction Company, Inc. ("KLP"), but, prior to trial, the

fraud and failure to provide insurance claims were dismissed.  The Third-Party Complaint

(Doc. #23) asserted identical (but differently numbered) claims against SEMCO

Construction Parent Company and SEMCO Iowa Construction Company, two companies

related to Iowa Pipeline.  The claims for fraud and failure to provide insurance in the

Third Party Complaint were similarly dismissed prior to trial.[1]

All of Vectren's claims center around its factual assertion that KLP failed to

remove a number of natural gas line "stop boxes," which the contractor was required to

remove pursuant to a construction contract it had entered into with Vectren.  Several

years after the construction project concluded, an explosion occurred at a home located at

3307 Lincoln Avenue in Evansville, Indiana, where one of the stop boxes had not been

removed.  In both its cross-claims and its third-party complaint, Vectren initially asserted

a claim for damages associated with the failure to remove numerous stop boxes.

However, immediately before trial, it dismissed its claims for damages or relief related to

---

[1] At trial, counsel for KLP mistakenly referred to the negligence claims in both the cross-claims and third-party claims as having been voluntarily dismissed; however, the negligence claims were never the subject of a voluntary dismissal.

the failure to remove stop boxes at any address other than at the address where the explosion occurred.

*Evidence at Trial*[2]

Most of the underlying facts are undisputed and have been stipulated during the course of the motions practice preceding the trial.  At trial, Vectren nonetheless elicited testimony from a number of witnesses and introduced exhibits in order to provide a context to the agreed facts and also to highlight the areas of disagreement between the parties.  KLP also introduced evidence through exhibits and on cross examination of Vectren's witnesses and by deposition testimony of two of its employees.  In the end, we hold that the evidence supports a judgment in favor of KLP.

**Undisputed and Stipulated Facts**

Southern Indiana Gas & Electric Company, Inc. is a public utility which distributes natural gas and electricity to homes and businesses in the Evansville, Indiana, area under the name "Vectren."  The utility entered into a construction contract with KLP Construction Company, Inc. ("KLP") on April 6, 2001, which covered two different gas

---

[2]In this section, we discuss the trial testimony of all but two of the witnesses who testified at trial.  In addition to the witness testimony discussed here, Vectren called two additional witnesses, Laura Pamplin and Lee McNeely.  Mrs. Pamplin and Mr. McNeely  provided testimony relative to the issue of damages and the propriety of settlements which Vectren reached with those making claims against Vectren following the explosion.  Because we have reached a decision that Vectren is not entitled to relief on its claims, we do not summarize or recount the testimony of Mrs. Pamplin or Mr. McNeely in this ruling.

line replacement/relining projects.  Subsequent to entering into this contract, KLP merged with Iowa Pipeline, and Iowa Pipeline became responsible for KLP's obligations.  Later, Iowa Pipeline merged with SEMCO Iowa Construction Company and changed its name to SEMCO Construction Parent Company.  For clarity and simplicity, in this ruling we refer to the utility as Vectren and the contractor as KLP.[3]

The two projects covered by the aforementioned construction contract included the Vann Avenue Low Pressure Conversion Project and the Covert Avenue High Pressure Cast Iron Replacement Project.  The Vann Avenue project was conducted in a residential area, was the first of the two projects to be completed and is the one most relevant to the issues in this case.  It required the contractor to insert new, small-diameter, high pressure plastic piping into existing, large-diameter, low pressure metal piping used to distribute natural gas to homes.   The new, high pressure plastic piping then served as the delivery system for the utility's natural gas.  This process is referred to as "relining" the gas distribution system.

The gas distribution piping system at issue here was comprised of main gas lines located in the streets and public right of ways, as well as service lines, which also were buried and ran from the main lines in the street to the risers located at each residential

---

[3]We recognize that during the trial there were times when an attorney or witness referred to the contractor as Iowa Pipeline and that the witnesses and attorneys sometimes referred to the utility as SIGECO; however, in an attempt to stay consistent with the names we most often used in the court's past written rulings, we continue to use KLP and Vectren, respectively, in reference to the two litigants in the case at bar.

address, where the gas was piped up into the customer's home.  Each existing metal

service line usually included a shut-off valve to allow the gas supply to the home to be

turned off or on.  When the valve was turned to the shut position, it stopped gas flow; this

occurred primarily in cases of fire or to allow work on a gas meter to be performed at or

near the home.  These shut-off valves were accessed through a metal cylinder, which was

buried in the ground at some point along the service line between the main pipeline and

the gas riser.  The gas riser channels the gas from the underground service line to the gas

meter located above ground near the foundation of the residence.  The cylinder straddles

the valve and is covered by a metal lid fastened down with a bolt.  The bolt can be

unfastened and the lid removed, allowing the shut-off valve to be accessed by inserting a

lengthy tool, referred to as a "key" or "wrench," through the opening at the top of the

cylinder and down into the ground several feet.  The cylinder is commonly referred to as

a "stop box" or "curb box" and, pursuant to the written contract, when KLP inserted the

new plastic piping into the old metal piping at each address, it was also to remove each of

these stop boxes so that any metal shut-off valve which remained would be inaccessible.

KLP began work under the contract in the spring of 2001 and continued working

throughout the remainder of the year.  The contract required Vectren to provide for the

inspection and approval of the work during the course of the project, and Vectren

eventually did accept and pay for all of the work KLP performed under the contract.

Though the contract was deemed completed and KLP was paid in full, it was

subsequently discovered that there were stop boxes which had not been removed during the course of the project.  One of the stop boxes which was not removed was located at 3307 Lincoln Avenue, Evansville, Indiana.

On April 3, 2004, two Evansville Water Department employees, Bradley Hoskins and Ray Reed, went to 3307 Lincoln Avenue to replace an old in-ground water meter. After locating the water meter pit, one of the men found and removed the lid from what turned out to be the Vectren gas line stop box, believing it was the lid to a water line stop box and expecting it to provide access to the water line shut-off valve.  Water flow needed to be halted in order to replace the water meter.  Water lines have stop boxes very similar in appearance to gas line stop boxes and they serve a similar purpose of allowing access to a shut-off valve.  Hoskins and Reed used a long key to reach down into the recessed stop box and turn the shut-off valve.  Because they had mistakenly accessed the gas line , their maneuver caused the metal valve to rupture the new plastic gas line which had been inserted during the low pressure gas line conversion project.  The two eventually realized their mistake, smelling the natural gas leak which they had caused. They immediately contacted Vectren to inform the utility that they had mistakenly damaged the gas line.

Vectren dispatched an employee, Dennis Williamson, who promptly arrived at the scene at approximately 8:30 a.m. and confirmed the gas leak.  Two other Vectren employees, David Durbin and Mark Rexing, arrived sometime thereafter to fix the leak.

After fixing the leak at the shut-off valve, Rexing entered the house to relight the gas appliances. Prior to doing so, he did not retrieve from his service truck any gas detection device. Consequently, when he entered the residence to relight the pilot lights on the appliances, he relied only on his own senses to determine if any gas had accidently seeped into the premises. Rexing successfully lit the pilot on the gas stove located on the first floor of the house and then proceeded to the basement to relight the pilot light on the furnace. When he attempted to light the pilot on the furnace, there occurred a huge explosion. According to the ensuing fire department investigation, gas had escaped from the ruptured plastic line, traveled down the metal line, exited near the foundation and infiltrated the basement. Tragically, the explosion killed the homeowner and her friend, both of whom were in the residence at the time, and injured Rexing.

### *Deposition Testimony of Kevin Pogue and David Stinnett*

Kevin Pogue and David Stinnett's testimony were introduced into evidence through their video-taped and summarized depositions. Pogue was a division manger with KLP who had signed the construction contract on its behalf. He managed the project for the contractor, though he was not present at the project on a day-to-day basis. Pogue was aware that the written contract required KLP to remove the stop boxes and also that the need for removal of the stop box was a safety issue. The onsite supervisor for Iowa Pipeline, David Stinnett, informed Pogue that stop boxes were being removed as a part of the project, generally, but also that difficulties in locating many of the stop boxes had led

to discussions with Vectren's chief inspector, David Carr, who had directed that any stop boxes which could not be visually identified along the route of the service line did not have to be located by more disruptive means or removed.

Stinnett testified that he was the foreman for both of the KLP construction crews which worked on the two projects.  He was often the person who walked the ground area where service lines were buried at the customers' addresses in search of the stop boxes. Stinnett testified that Vectren did not provide him with any "valve card" or information which would help him or his crews locate stop boxes at individual addresses. If a box was located, he would have the crew remove it, unless it was embedded in concrete, in which case they would simply take steps to render the valve inoperable.  Stinnett understood that the written contract required KLP to remove stop boxes at each address as the crews inserted the plastic pipe through the old metal piping.  The stop boxes were buried 15 to 40 inches deep and, while most had covers in place, some boxes were missing their lids or had been previously backfilled.  Some service lines did not have functioning stop boxes or shut-off valves.

Stinnett understood that the stop boxes were being removed in order to render the old metal shut-off valves unusable because, if the valves were turned after the plastic pipe had been inserted, the valves could damage the new gas lines and cause gas to escape.  He testified that, while he never confused the two, he noticed that at times there were water line stop boxes in the same area as gas line stop boxes.  The gas line stop box lids had

-8-

stamped into them the word "gas," so he did not believe that, should a stop box with such a lid be mistakenly left in place, it would ever be confused with a water line stop box. He testified that there were instances in which he was unable to find a stop box at an address. According to Stinnett, David Carr, Vectren's chief inspector, told him that, if he and his crew were unable to visually locate a stop box after walking the area above the buried service line, they did not have to dig up the yard to find and remove it, and they should proceed on to the next address.

***Testimony of Michelle Lynch***

Michelle Lynch, a 2001 civil engineering graduate and the project engineer assigned by Vectren to the Vann Avenue project, was in charge of designing and overseeing gas line improvement projects for the utility, some of which were completed through outside construction projects and some of which were completed by Vectren's own crews. Before any project was let out for bids, Lynch assembled a binder of available gas service orders for each address affected by the project in order to assist in reaching an overall cost estimate. Gas service orders served as a type of "as built" drawing for each customer's service location or address. The service orders were retained as a permanent record, reflecting any and all changes occurring to the service installation at that address. The service orders contained information regarding the gas service from the main to the meter, including the materials used and the approximate location of the

service line, meter and any stop box.[4]  Any changes or repairs to a service line were documented through a new gas service order.  If Lynch was unable to locate a gas service order for a particular address included in the project, she inserted a blank page into the binder.

After KLP's bid was selected and the contract awarded,  Lynch transferred the gas service order binder to David Stinnett, informing him that it contained the most current information on the service lines to be updated as a part of the project.  Lynch believed it was important for the contractor to have the service order binder so that KLP's employees would know how to create a new gas service order after completing the pipe relining at each address.  She disagreed with Stinnett's statement in his deposition testimony that he had not been provided information which would have helped him locate the stop boxes,

_____

[4]Ms. Lynch identified a small dot on the hand drawn rendering of the service line installation for 3307 Lincoln Avenue prior to the relining project as a representation of where the stop box was located in relation to the gas main and the riser near the base of the residence.  The drawing was on the back of the service order and, because there was no legend or key, the purpose of the dot was not self-evident.

indicating that the hand service orders in the binder she had given him provided such information.

Early in the project, Lynch trained a KLP employee (the person to whom Stinnett had entrusted the service order binder) on the procedure for recording the changes that the contractor made at each address through preparation of a new gas service order for the utility's permanent records.  After performing the relining at each of the addresses included in the project, the contractor was required to provide updated gas service orders for the affected addresses to David Carr, the chief inspector for Vectren, who was, in turn, responsible for approving the service orders and checking it to see if any work had been performed that warrantesd an extra charge by the contractor.  Lynch indicated that after Carr approved the changes made at each address, he would return the revised gas service orders to the utility's permanent records.

Anticipating possible customer complaints regarding damage from excavation on their property during the course of the work, according to Lynch, Vectren informed potential bidders on the project during the pre-bid meeting that, because some of the relining work would occur in upscale neighborhoods with expensive landscaping and well-manicured lawns, the prevailing contractor would need to avoid excessive excavating that might generate customer complaints and cause Vectren to incur expensive lawn rehabilitation costs.  Indeed, these same concerns caused Vectren to utilize a more expensive directional boring process to place new piping in some areas on this project in

lieu of the more common open trenching process.

Lynch testified that she had expected the stop boxes at each address would be removed, based on three factors: first and foremost, because the contract called for it, but also because it would be dangerous to leave them in place and because she believed that the shut-off valve would likely cause a constriction in the metal piping that would make it difficult to push the smaller plastic piping through without removal of the valve. She recalled that, early on in the project, the contractor encountered stop boxes which were difficult to remove and that the excavation of those difficult boxes caused major damage to customer's lawns.

Lynch conceded that not all stop boxes could be visually located due to the effects of time and yard conditions. However, when she conducted her own inspections of the work being performed under the contract, which focused primarily on the installation of the main gas lines as opposed to the service lines, Lynch did not include any check on whether the stop boxes on service lines had been removed. Lynch testified that she was not the principal inspector and that she performed her inspections pursuant to instructions given to her by David Carr of Vectren, who was both the principal inspector as well as the Vectren employee present at the job-site on a daily basis. According to Lynch, David Carr made the decisions on behalf of the utility regarding day-to-day issues or problems arising in conjunction with the project and was authorized to and did sign off on the work performed at each individual address.

Lynch testified that she was shocked to learn, based on the post-explosion inspections conducted by Vectren, that stop boxes had not been removed from more than 200 addresses included in the 2001 construction project[5] and that, in fact, throughout all of Vectren's plastic pipe relining projects, whether performed by outside contractors or in-house crews, a high percentage of the stop boxes had never been removed. According to her testimony, David Carr would have supervised most, if not all, of those projects.

***Testimony of David Carr***

David Carr's employment with Vectren began in 1972 and beginning in 1991, he served as a Field Supervisor in the pipeline construction area for the utility's gas delivery system. Regarding the project at issue here, Carr indicated that he had attended the pre-bid meeting for the Vann and Covert Avenue projects in 2001 and served as Vectren's Field Supervisor during construction. He worked closely with David Stinnett, KLP's foreman on the two projects, and had principal responsibility on behalf of Vectren for inspecting the work. Carr supervised and inspected other Vectren construction projects which were also underway throughout 2001, spending approximately an hour each day at the Vann Avenue project. For the most part, like Lynch, Carr's inspections focused on the contractor's installation of the gas mains in the street, because of the more

---

[5]The second volume of stipulated exhibits (Joint Exhibit 1-B) contains a spreadsheet detailing the results of the post explosion inspection of service lines at addresses involved in the two projects that were part of the 2001 relining contract between KLP and Vectren. The spreadsheet is located behind tab 27 and labeled Defendant's Exhibit 27.5.

complicated nature of that part of the work.

Carr testified that during the course of the project, due to time constraints, he could not possibly have inspected all of KLP's work. He expected KLP, an experienced pipeline contractor, to perform the job according to the contract. From time to time, Carr admitted, he would modify the requirements of the contract due to conditions discovered during performance of the work. For example, he testified that he allowed KLP to fill a stop box with concrete, rather than remove it, because the homeowner had poured an expensive exposed aggregate driveway around this particular box and he wanted to minimize the damage from the relining at that address.

However, other testimony by Carr regarding modifications to the contract as to when KLP was required to remove stop boxes was inconsistent. After describing the circumstances regarding the driveway mentioned above, Carr was asked : "Other than that incident that you've just told the court about, did you ever tell KLP on this project that they did not have to remove a stop box?" He responded: "No." Yet, later he conceded that he did tell KLP that it was not required to remove a stop box if the stop box could not be located without excavating the length of the service line. Carr justified this oral modification of the contract on the grounds that, if the stop box could not otherwise be located, it might not be there at all, having been removed previously, and, "if we dug the whole service line out, at that point we could have actually placed the new service in the ditch."

Carr confirmed during his testimony that KLP was provided gas service orders for the addresses covered by the project which orders could have assisted them in locating the stop boxes.  He further confirmed that the contractor had a tool known as a "dip needle," which might have helped to locate the metal lid of a stop box covered by dirt or sod, sos long as it wasn't "real deep."  Generally, Carr expected to find stop boxes installed near the property lines of residences; however, his inspections of Iowa Pipeline's work never included any report that a stop box had not been removed.  Carr did not dispute that he was the utility's job-site representative and that, as a result of his and Ms. Lynch's inspections, at the conclusion of the project, KLP's work was officially accepted and the contractor was paid in full by Vectren.  He acknowledged his approval of, and signature on, the new gas service order for 3307 Lincoln Avenue, which had been  prepared and submitted to him by KLP following completion of  the relining work on the service line at that address.

When Vectren first began relining its gas delivery system, it had no established policy requiring removal of stop boxes.  At some subsequent time, a policy was adopted requiring removal of stop boxes as part of the relining projects.  The relining of the Vectren system was performed both by in-house crews and outside contractors, and Carr was Vectren's primary inspector on both kinds of installations.

Following the explosion, Carr participated in Vectren's effort to determine the number of stop boxes still in place at or in connection with the 13,679 addresses where

-15-

plastic pipe relinings had been performed on the service lines.  Of those 13, 679 service

lines, it was discovered that 2,437 still had stop boxes which had not been removed.  No

determination was made of the reason(s) the stop boxes were left in place.  Carr's initial

conclusion was that some of the stop boxes may have been located at addresses which

had been relined prior to Vectren's policy change, but, in fact, the percentage of stop

boxes left in place during the Vann Avenue and Covert Avenue projects essentially

matched the percentage of stop boxes left in place in all the other relining projects prior to

that time.

### *Testimony of Raymond Reed, Jr. and Bradley Haskins*

Mr. Reed and Mr. Haskins, the employees of the Evansville Water Department,

worked together as a team on the day of the explosion.  Because this days's events

occurred on a Saturday, they had been working to earn overtime by "changing-out" water

meters at various residences.  They arrived at 3307 Lincoln Avenue at approximately 7:30

a.m. to perform what was to be the first of several residential meter replacements

scheduled for that day.  Reed testified that they were to locate the in-ground water meter

pit and follow the sight line from it to the street in order to located the water stop box

where, after accessing it by removing the ground level lid and reaching down inside it,

they would manipulate the valve found within the stop box to halt the water flow.

According to Reed, the size, shape and composition of a water stop box lids were

virtually identical to gas line stop box lids, and the valves located within the two types of

stop boxes were also quite similar, permitting both to be operated by use of the same type of key or wrench.

After locating the water meter at 3307 Lincoln Avenue, Reed undertook the search for the water stop box lid.  In less  than a minute, he found a stop box lid that he determined to be in line between the water meter and the water main near the street.  Reed tapped the lid with his foot to remove some accumulated sod that covered the rusty lid and told Haskins that he had located the stop box and would retrieve a new meter from their service van.  Haskins, in possession of the wrench required to remove the single bolt holding the stop box lid, went to the place where Reed had found the stop box and removed the lid.  Reed and Haskins assumed the stop box they were accessing was the one for the water line, though neither of them looked closely enough at the lid to see that the word "GAS" was imprinted in relatively large letters on it.  Dirt which had accumulated inside the stop box was removed allowing them to reach the shut-off valve, after which they placed the key/wrench over the stopcock for the shutoff valve, ostensibly to shut off the flow of the water.  Both Reed and Haskins tugged on the key to move the valve into the off position.  Reed testified that the difficulty they experienced in turning the stopcock on a water shut-off valve was not unusual, but Haskins reported that the maneuver felt different than usual because, as he knows now, they were actually crushing plastic piping.  Haskins also testified that, because of the similarities between the gas and water stop boxes and their shut-off valves, the only way a person could have been certain

-17-

which kind of stop box he was accessing was by reading the stamped in label on the lid, which, he admits, he should have done on this occasion but did not do.

When Reed attempted to replace the existing water meter, he discovered that water was still running through the meter which meant that the water line had not been shut-off. He returned to the stop box with the key/wrench in place, where he and Haskins "cranked it down" even tighter, at which point they began to smell gas. They immediately notified the gas company of the problem they encountered and the leak they had caused. The Vectren dispatcher informed them that a crew would be sent out to deal with the situation. While awaiting the arrival of the Vectren repair crew, Reed and Haskins completed their work by locating the water stop box with a metal detector and performing the change-out of the water meter. They departed the scene before anyone from Vectren had arrived. After completing similar work at another address, the two water department employees returned to 3307 Lincoln Avenue to make sure that someone from the gas company had arrived to take care of the leak, where prior to their leaving a final time they spoke with a Vectren representative present at the scene.

***Testimony of Dennis Williamson***

Dennis Williamson was the Vectren employee on call on April 3, 2004, whose duties included responding to problems that developed that day with the gas distribution lines. He received the call at home from Vectren's dispatcher shortly before 8:00 a.m.

reporting that a water department employee had called in to report damage to a gas line at 3307 Lincoln Avenue.  Williamson, who lived approximately 20 miles from the Lincoln Avenue address, arrived at the scene approximately 8:30 a.m..  Using a gas detection device known as a "Track-It," he attempted to identify the location of the gas leak which, based on what he smelled, heard and felt, he traced to the stop box.  Williamson testified that he walked the length of the service line utilizing the Track-It device and determined that gas was escaping only from the ground area around the stop box.  He turned off the flow of gas at the meter, which had the effect of extinguishing the pilots for gas appliances within the home. Williamson spoke with the homeowner, who had not yet been informed of the leak, and told her of the leak and that a Vectren crew would be coming out to dig out the stop box and make the required repairs.  He then contacted the Vectren dispatcher to request deployment of a repair crew; Williamson remained at the scene until the arrival of the two-man crew.

The two Vectren employees dispatched to fix the leak were David Durbin and Mark Rexing. Upon their arrival, Williamson provided them with the paperwork he had created and informed them of the location of the leak.  Williamson departed never assuming that any gas might have escaped inside or near the residence.  Williamson admitted that he did not check for gas within the home, contrary to Vectren's recommended emergency response procedures, and that he never employed  a "CGI" device which would have detected gas escaping into the subsurface.

-19-

***Testimony of David Durbin***

David Durbin's assignment with Vectren was that of a "fitter" in the gas construction department.  His duties included responding to service calls when gas lines were damaged or severed.  On April 3, 2004, Durbin received a call at approximately 9:15 a.m. directing him, along with Mark Rexing, to go to 3307 Lincoln Avenue to repair a leaking service line which had been damaged by water department employees when they mistakenly turned a gas shut-off valve.  Durbin testified that when  he received the call, he was not completely surprised because he had previously heard of such incidents occurring.

Durbin and Rexing drove to 3307 Lincoln Avenue and met up with Williamson at approximately 10:00 a.m..  According to Durbin, Williamson informed them of the location of the leak, provided them the relevant paperwork and told them that he had found no indication of gas escaping closer to the home.  Durbin and Rexing dug out the stop box and located the source of the leak.  After approximately thirty minutes of work, they had closed the valve and shut down any further flow of gas.  After another twenty minutes, they fully completed the gas line repair.  At the time of the arrival of Durbin and Rexing, no occupants were in the home.  However, by the time their repair was finished the owner of the residence had returned in the company of one of her friends.

Durbin testified that Rexing entered the home with the owner and her friend in

order to relight the gas appliances; Durbin returned to the service truck to finalize the

paperwork on the repair.  Included on the service truck was a CGI gas detecting device

which would have assisted in determining if gas had infiltrated the residence, but neither

Durbin nor Rexing made use of it either during the course of performing the repairs or

before relighting the gas appliances within the home.  Shortly after Rexing entered the

home along with the owner, Durbin heard a loud explosion and turned around to see that

the residence had been completely leveled.  Durbin testified that he still does not know

"how that much gas got into the house."

### Testimony of Mark Rexing

Rexing, who surprisingly survived the blast, recounted a similar version of events

leading up to the explosion.  Approximately two hours after beginning their work at the

scene, he had entered the home to relight the pilot lights.  He first relit the stove, which

was located on the ground floor, after which he and the owner descended into the

basement to light the furnace pilot.  Rexing testified that he never smelled any gas during

the time he was in the home nor did the owner of the home or her friend indicate to him

that either of them smelled gas.  Rexing had dropped to his knees in front of the furnace

in order to light the pilot when the match ignited the natural gas that had collected in the

basement.  Rexing suffered severe burns as a result of the explosion.

Rexing acknowledged that a gas detecting device had been available to him for use

at the scene, but that he did not use it when he entered the home to relight the pilot lights. According to Rexing,  prior to the time of the explosion at 3307 Lincoln Avenue, employing such a device within a residence before relighting a pilot was not required procedure at Vectren.

***Testimony of Mike Singer***

Mike Singer, Vectren's current Operations Manager for the Evansville Metro Region, was Superintendent of the Gas Department at the time of the Vann Avenue and Covert Avenue relining projects.  David Carr and all construction inspectors on such projects reported to Mr. Singer.  The Vann Avenue project involved 440 addresses where existing service lines were relined with plastic piping; the Vann Avenue and Covert Avenue projects together involved approximately 660 addresses.  Following the explosion, Vectren conducted a survey of the addresses where service lines had been relined by KLP in connection with the two projects.  The survey was conducted under Singer's direction and was undertaken in order to identify any additional stop boxes which had not been removed.  After identifying unremoved stop boxes at addresses covered by the Vann and Covert Avenue relining projects, Vectren extended the survey to include all addresses in the gas delivery system where relining had occurred.

The survey began with a visual inspection of the Vann and Covert Avenue addresses, which, according to Singer, revealed very few stop boxes.  Phase Two of the

survey entailed a more extensive search for stop boxes based on a review of the gas

service orders for each address and by use of metal detectors.  Singer testified that Phase

Two inspections disclosed approximately 130 unremoved stop boxes at addresses which

had been part of  the Vann and Covert Avenue projects.  A third phase of the survey

extended the search throughout Vectren's entire system to all addresses which had been

included in any past relining projects, and, out of those 13,679 addresses, 2,437 had stop

boxes which had yet to be removed.  This larger survey did not establish whether Vectren

or one of its contractors failed to remove or deactivate the stop boxes still in place or

whether any particular stop boxes were still in place due to Vectren's former policy which

did not require the removal of stop boxes when a service reline was installed.

### *Discussion & Findings*

We begin our discussion by noting that Vectren offered no evidence at trial which

would tie SEMCO Construction Parent Company or SEMCO Iowa Construction

Company to KLP in such a manner as to shift liability to them for KLP's alleged breach

of contract, failure to indemnify or negligence.  Accordingly, Defendants, SEMCO

Construction Parent Company and SEMCO Iowa Construction Company are entitled to

judgment in their favor on Vectren's Amended Third Party Complaint.

Motions were interposed by both Vectren and KLP, and argued during the course

of the trial and/or at the close of evidence, addressing Vectren's cross-claim against KLP

for negligence.  KLP's motion challenged the availability of such a recovery in Vectren's favor, if the claim is premised upon an alleged contractual duty.  KLP also argued that the pleadings did not preserve a negligence claim because the duty alleged as pled arose out of the parties' contract.  In response to KLP's arguments, Vectren sought at the end of the evidence to amend the pleadings to conform to the evidence, which according to Vectren included the negligence claim which had been fully developed throughout the litigation.

We concede that, ordinarily, such motions as these are best resolved prior to the Court's addressing the merits of the underlying issues.  However, in this instance, we are persuaded that a full merits based review of Vectren's breach of contract claims will place Vectren's proffered negligence claim in a clearer light and explain the reasoning behind our conclusion that a negligence claim is unavailable to Vectren against KLP on the facts as adduced here.

***Breach of Contract - Failure to Remove Stop Boxes***

Whether KLP was contractually obligated to remove the stop box located on the gas service line at 3307 Lincoln Avenue and failed to do so in breach of that requirement is the central issue in this case.  Vectren contends that KLP was expressly required to remove the stop boxes, including the one at issue here, pursuant to the written construction agreement between the two parties, and that it failed to do so.

The familiar, well-settled, essential elements of a breach of contract claim under Indiana law are: (1) the existence of a contract, (2) the defendant's breach thereof, and (3) resulting damages.  *Rogier v. American Testing & Engineering Corp.*, 734 N.E.2d 606, 614 (Ind. App. 2000), *trans. denied*.  Here, no controversy exists regarding the fact that the parties entered into a written contract, the explicit terms of which required KLP to remove all stop boxes on service lines which they were relining.  However, a factual dispute has arisen over whether this provision was partially waived by Vectren, so as to excuse KLP from its duty to perform with regard to that particular stop box (as well as some others), thereby providing KLP a valid defense to Vectren's claim that KLP breached their agreement

KLP asserts that Vectren's agent, David Carr, modified the contract provisions with regard to the removal of certain stop boxes including the one at 3307 Lincoln Avenue and the evidence adduced at trial supports that finding.  In his deposition, David

Stinnett, KLP's foreman, testified that, after the project was underway, David Carr determined that any stop boxes which could not be visually located on a particular property did not have to be removed in the course of the relining project.  On cross examination, Stinnett stated that he agreed with KLP's response to an interrogatory which asserted that Carr had said that, due to concerns about resident complaints over damages from excavation, there was no need for Vectren to dig up the length of the service line if a stop box could not be located through a visual search.  According to the testimony of Vectren's own witnesses, a concern arose regarding damage to lawns and landscaping that would result from the excavation on the Vann Avenue project due to its location in a residential area comprised of nice homes with well kept yards.  That concern existed as early as the pre-bid meeting with the bidding contractors.

        In response to questioning by Vectren's counsel, Stinnett testified that it was his understanding that KLP nonetheless was required to make a good effort at each address to visually locate any stop box, but, if after such effort none was found, the contractor was not required to excavate the length of the service line in search of it.  He further stated that he and his crews made that effort.  Kevin Pogue, to whom Stinnett as Foreman of the project reported, testified that Stinnett had explained to him that, due to the problems encountered in attempting to locate the stop boxes, Carr, on behalf of Vectren, had determined that any stop boxes located through a visual examination of the service line area were to be removed, but no excavation was required in order to locate the boxes.

David Carr's testimony was key despite his conflicting responses regarding his authorization of this change to the contract.  Initially, on direct examination in response to being asked whether he ever told anyone with KLP that they did not have to remove a stop box, Carr answered emphatically that he did not.  Thereafter, however, he conceded that he did modify the requirement with regard to a stop box found in a driveway that had been paved with aggregate concrete which, had the stop box been removed, would have necessitated costly repairs.  In response to a follow-up question which excluded the situation with the stop box located in a driveway, Carr emphatically stated again that he had never told anyone at KLP that they did not have to remove a stop box.  However, at the conclusion of his direct examination, Carr again retreated from his earlier categorical denial when, his response to another "Did you ever" question from Vectren's counsel, Carr admitted that he had indeed told KLP that they did not have to remove a stop box at any customer's address if excavation of the service line was required to locate it.

There is no dispute that, as the site representative for Vectren, Carr had the authoirty to orally modify the terms of the contract.  Indeed, that seems to be precisely what he did when he excused KLP from digging up certain stop boxes which could not otherwise be located.  In fact, the following exchange which occurred at the very start of counsel for KLP's cross-examination is telling, Carr stated:

> Q.  Mr. Carr, you answered Mr. Funk's questions, ... but you do acknowledge that you did allow an oral modification to the contract to take place in which KLP did not have to remove a stop box, in your testimony at one occasion, correct?

A.  Yes.

Q.  And you did not record that anywhere or make anyone aware of that modification, correct?

A.  No.

Q.  You also told us that you do acknowledge telling KLP that they did not have to dig the length of pipes to remove stop boxes if they otherwise could not locate it, correct?

A.  If they otherwise couldn't locate it, yes.

We pause, for sake of accuracy, to make clear here a technical legal distinction: what Carr authorized was a waiver of contract provisions rather than a modification of the contract.  A contract modification is, in itself, a contract and therefore requires an offer, acceptance and consideration.  *Hamlin v. Steward*, 622 N.E.2d 535, 539 (Ind. App. 1993).  "To constitute consideration, there must be a benefit accruing to the promisor or a detriment to the promisee."  *A & S Corp. v. Midwest Commerce Banking Co.*, 525 N.E.2d 1290, 1292 (Ind. App. 1988).[6]  Waiver, in contrast, is the relinquishment of a known contractual right, which can occur through a formal acknowledgment of the waiver, such as Carr's directions relieving KLP of the necessity of digging the length of the service

---

[6]There is some basis on which to argue that Vectren did, in fact, receive a benefit from Carr's relinquishment of the requirement that KLP  dig up a lawn in search of a stop box, namely, it was spared having to deal with homeowners who were upset by the damage to their yards.  This benefit might have constituted sufficient consideration allow Carr's revision of the contract to be deemed a modification as opposed to a waiver.  KLP has defended against Vectren's breach of contract claim from the start by arguing that Carr's onsite directions had modified the contract, but, because it also pled waiver as an affirmative defense, the difference is merely technical, so we shall go no further with our legal analysis.

pipe simply to locate and remove a stop box, or through a party's conduct, such as Carr's

acceptance of KLP's completion of the project and payment for the work performed, as

evidenced by Carr's signature on the new gas service order created by KLP for that

address and approval of payment.  *See Harrison v. Thomas,* 761 N.E.2d 816, 820 (Ind.

2002); *International Health & Racquet Club, Inc.  v. Scott*, 789 N.E.2d 62, 66 (Ind. App.

2003).

Carr also testified that neither he nor anyone else inspecting or approving KLP's

work ever noted the failure of KLP to remove a stop box at any service address; this is

further evidence of a waiver by Vectren.[7]  Based on the subsequent survey conducted by

Vectren following the explosion, it was discovered that approximately twenty percent of

the stop boxes at addresses included in the Vann and Covert Avenues relining projects

had not been removed.  Vectren's Operations Manager, Mike Singer, validated KLP's

assertion that Carr had orally changed the terms of the contract in not requiring KLP to

remove stop boxes which could not be located visually when he was asked to describe the

post-explosion survey.  Singer recalled that the survey proceeded in two-phases - first a

---

[7]Vectren argues that any failure on its part to inspect can not be deemed a waiver because the contract General Conditions which require inspection by the owner also provide  that its inefficiency, negligence or omission in conducting any inspection and discovering unsatisfactory work does not relieve the contractor from its obligation of full compliance with the contractual terms.  Our ruling, however, is not based on any inadequacy in Vectren's inspection; rather, we simply note that the inspection reports omit any mention of a failure to remove a stop box at any location, which supports KLP's contention that a waiver (contract modification) occurred based on Carr's telling Stinnett that Vectren did not require KLP to remove a stop box, if it could not be  located through a visual search.

visual search of all the addresses which comprised the Vann Avenue and Covert Avenue projects, which according to Singer, revealed "very few stop boxes." But, according to Singer, Phase Two, which entailed in-person visits by Vectren's crews utilizing pipe locators and metal detectors, was successful in locating the vast majority of stop boxes which had not been removed by KLP, lending credence to the contractor's contention that during the course of the project Carr had altered the contract by deciding that Vectren would not require removal of stop boxes if excavation was necessary to locate them.

Vectren has the burden to prove the existence of a contractual obligation requiring KLP to have removed the stop box at 3307 Lincoln Avenue. Our review of the evidence causes us to conclude that Vectren has been unsuccessful in its efforts to carry that burden. The evidence is clear that Carr changed the terms of the construction contract between Vectren and KLP, an action that he was fully authorized to take as Vectren's agent, more specifically its construction Field Supervisor. Carr's action evidenced Vectren's concern over possible costs associated with repairing the damage caused by the excavation required to locate and remove numerous stop boxes which could not otherwise visually identified. Carr, therefore, waived the contractual requirement that such stop boxes be removed. The survey results further establish that KLP removed only the stop boxes which could be located visually. Finally, it is probative of Vectren's waiver that its construction inspectors attributed no failures by KLP to remove stop boxes in any of their

inspection reports, nor did its post-explosion reports to the governing state agency attribute any fault to KLP.

Carr told Stinnett that KLP did not have to "go digging up the service line" in an effort to locate a box which had otherwise not been located.  That admission establishes conclusively a change of contractual requirements.  Even if we were to hold that Carr's oral modification required KLP to go beyond a visual inspection to locate the stop boxes, the record of the trial is void of any evidence regarding the efforts specifically made by KLP at 3307 Lincoln Avenue to locate the stop box.  Vectren adduced no evidence to demonstrate that the search conducted for the stop box at 3307 Lincoln Avenue failed to meet Carr's precondition for avoiding or excusing removal of the stop box.  Further, Carr's  approval of the new gas service order for that address following the relining of the service lines is consistent with the finding that he had waived the requirement under the contract to remove the stop box.

Accordingly, KLP is entitled to judgment in its favor on Vectren's amended cross-claim for breach of contract based upon KLP's failure to remove the stop box at the 3307 Lincoln Avenue address.

**Breach of Contract - Failure to Indemnify**

The General Conditions section of the construction contract between Vectren and KLP contained the following indemnification provision:

THE CONTRACTOR AGREES TO INDEMNIFY, DEFEND, AND HOLD HARMLESS OWNER AND ITS AGENTS AND EMPLOYEES from any claims, demands, or liability of any kind or nature for injuries or damages to any person or property growing out of the performance of this Contract or arising in any manner, ways or means from any product supplied or activity required by this Contract, WHETHER DUE IN WHOLE OR IN PART TO THE NEGLIGENCE OF OWNER, ITS AGENTS OR EMPLOYEES OR THE CONTRACTOR, ITS AGENTS OR EMPLOYEES OR OTHER PERSONS OR ENTITIES ENGAGED IN THE PERFORMANCE OF THE CONTRACT, OR THE JOINT NEGLIGENCE OF ANY OF THE AFORESAID IN COMBINATION.

Vectren seeks indemnification from KLP for the various personal injury and property damage claims filed against Vectren based on the explosion.  KLP has refused to indemnify Vectren maintaining that it is not required to indemnify Vectren because the explosion did not arise or grow out of the work performed by KLP pursuant to the contract.

In our March 7, 2008, ruling denying Vectren's motion for summary judgment on its cross-claim for failure to indemnify, we stated that it was undeniable that the written construction agreement between the parties called for KLP to remove all stop boxes. However, in a footnote, we stated as follows:

Contractor maintains that it was told by a Vectren representative that it did not have to remove any stop boxes which it could not readily locate by means of a visual search. Contractor is free to present evidence of such a contract modification at trial, if the terms of the contract allow for such a modification. If Vectren contests the claim of a modification, the jury will decide. Obviously, if Vectren was no longer contractually required to remove stop boxes, the explosion could not have grown out of its

performance of the contract.

Following our prior ruling, Plaintiff Estate of Josie Williams settled all its claims, leaving for trial only the cross-claims. The trial has now been concluded and, as noted above, it is clear that a change in the contractual terms occurred, either through waiver or oral modification, which relieved KLP from the obligation to remove the stop box at 3307 Lincoln Avenue, Evansville, Indiana. Consequently, the personal injuries and property damage incurred by others for which Vectren seeks to be indemnified by KLP, cannot be said to have grown out of the performance of the contract or arisen in any manner, ways or means from an activity required by the contract. Therefore, KLP is entitled to prevail against Vectren on Vectren's amended cross-claim for failure to indemnify as required by contract.

### Negligence

Any negligence claim which Vectren is entitled to assert against KLP must be based on a duty owed by KLP to the utility. KLP has settled all claims brought against it by other parties to this litigation. Whether KLP owed a duty to Vectren is a question of law and, in this case, necessarily emanates from the contractual relationship between Vectren (as the owner of the natural gas delivery system) and KLP (as the party Vectren contracted with to perform work on its piping system). *See Greg Allen Const. Co., Inc. v. Estelle*, 798 N.E.2d 171, 173 (Ind. 2003). Clearly, no independent duty to remove stop

boxes can be imposed on KLP simply because it was relining part of Vectren's gas delivery system.  Thus, as was true in the *Greg Allen Construction* case, "here there is no claim of injury that the law would protect if there were no contract."  *Id.*

Carr's change in the terms of KLP's obligation to remove all stop boxes, as originally provided for in the contract, vitiated any duty otherwise owed by KLP to Vectren to remove the stop box at 3307 Lincoln Avenue assuming it could not be visually located.  No evidence was adduced to show that the stop box was capable of being, or should have been, with due care, visually located at the time of the relining project.  Furthermore, even if we were to construe Carr's declaration to impose a different affirmative duty on KLP, namely, that the boxes that were visually located or otherwise easily identified without significant digging had to be removed, there remains no evidence to establish that  KLP breached any duty created by that obligation.  While Stinnett testified that he was often the person who walked around a Vectren customer's property in search of the stop box, he had no specific recollection of the address at issue and the evidence did not include any reference to a specific person or official or agent who performed the search for the stop box at 3307 Lincoln Avenue at the time KLP relined the service piping.  Nor was there any other evidence of what specifically occurred in connection with any attempt to find it.  Vectren's failure of proof on this point is exacerbated by Carr's approval of the new gas service order following completion of KLP's work at that address.

KLP's defense to a negligence claim by Vectren is further buttressed by the fact that the contract also required Vectren to inspect the work being performed by KLP. Despite the provision of their contract that holds Vectren harmless for its own failure to identify the unsatisfactory or incomplete work through inspection, that savings provision does not negate the statutory requirement that Vectren bring its negligence claim within two years of the time that a reasonably diligent party would have ascertained that it had been damaged. *UNR-Rohn, Inc., a Division of UNR Industries, Inc., v. Summit Bank of Clinton County,* 687 N.E.2d 235, 240 (Ind. App. 1997). Vectren's contractual duty as a reasonably diligent party required it to inspect the work of its contractor in performing the work it was hired to do was to ascertain in a timely and appropriate fashion any damage from nonperformance of the contractual terms it might have suffered at the time of the required inspection.[8] Accordingly, it is clear that Indiana's two-year statute of limitations for negligence claims expired long before the explosion occurred, rendering Vectren's attempted negligence action untimely and thus futile. *See* Ind. Code § 34-11-2-4.

If the Court were to grant Vectren's belated request to amend its pleadings to include an alternative negligence claim against KLP, that claim would fail for want of any independent duty on the part of KLP to remove all the stop boxes. Given Carr's verbal change to the written contractual obligations, no duty arose - contractually, by negligence standards, or otherwise - that required KLP to remove the stop box at 3307 Lincoln

---

[8]Any claim by Vectren that it had yet to be damaged at the time it was to have performed the inspection would negate any claim that the explosion was forseeable.

Avenue if it could not be visually located.  Further, there is no evidence that the stop box should have been located through a reasonably diligent visual search when KLP performed the work at that address.  If any such duty arose to remove the stop box, there was a corresponding contractual responsibility for Vectren to identify any nonfeasance which caused the work to be deficient and to bring an action based on such nonfeasance within two years following its inspection or its acceptance of the work and payment of the contract.  Accordingly, judgment in favor of KLP is warranted on Vectren's putative negligence claim as well, and the motions interposed by Vectren to amend the language of its negligence claim, while considered, are denied as moot.

### *Conclusion*

The evidence at trial has brought not only clarity but finality to the protracted dispute that has for so long occupied the parties.  Based on the brief, two days of trial, the evidence made clear the crucial fact that, during the time the relining projects were underway, the removal of gas stop boxes was not a primary concern of anyone directly involved in the project.  It only became important following the tragic explosion on April 3, 2004, when the need to assess and assign fault arose.  Only then did it become clear that the removal of the stop boxes, left in place by the work crews with the approval of Vectren's supervisor and overlooked by all its inspectors on numerous occasions and apparently never viewed as an obstacle to the acceptance of contract completion by KLP, had greater legal significance.

Based on the findings of fact and conclusions of law explicated above, the court hereby rules in favor of KLP and against Vectren on all of Vectren's Second Amended Cross-claims.  The Court also finds that judgment should enter in favor of SEMCO Construction Parent Company and SEMCO Iowa Construction Company on Vectren's Amended Third Party Complaint.  A separate final Judgment shall be entered accordingly.

**IT IS SO ORDERED.**

Date:   09/15/2009

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:
Norman T. Funk
HILL FULWIDER MCDOWELL FUNK & MATTHEWS
tom@hfmfm.com

Richelle Marie Harris
FROST BROWN TODD LLC
rharris@fbtlaw.com

Patrick A. Shoulders
ZIEMER STAYMAN WEITZEL & SHOULDERS
pshoulders@zsws.com

Emily Dawn Smith
HILL FULWIDER MCDOWELL FUNK & MATTHEWS
emily@hfmfm.com

Keith W. Vonderahe

ZIEMER STAYMAN WEITZEL & SHOULDERS
kvonderahe@zsws.com

Laura L. Pamplin
VECTREN CORPORATION
llpamplin@vectren.com

Kevin C. Schiferl
FROST BROWN TODD LLC
kschiferl@fbtlaw.com